UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SUSAN WILSON COWAN,

Plaintiff,

v.                                                      Case No. 21-cv-895-RMM

FEDERAL COMMUNICATIONS
COMMISSION,

Defendant.

**MEMORANDUM OPINION AND ORDER**

This is a FOIA action brought by journalist Susan Wilson Cowan ("Ms. Wilson") against

the Federal Communications Commission ("FCC").  Ms. Wilson seeks documents that the FCC

obtained from Sinclair Broadcast Group ("Sinclair") after the company's proposed acquisition of

another television broadcast company, Tribune Media Company ("Tribune"), drew significant

scrutiny from both the FCC and the public at large.  The documents Sinclair sent to the FCC

ultimately formed the basis of a consent decree, in which the FCC determined that Sinclair had

structured its planned transactions based on a good faith interpretation of FCC rules.  Ms. Wilson

believes the documents will tell a different story.  The FCC agreed to produce some of the

documents requested but withheld others under FOIA Exemption 4.  The parties have cross-

moved for summary judgment; the FCC also requests a protective order to shield from further

disclosure information the agency inadvertently disclosed.[1]  For the reasons set forth below, the

---

[1] The opinion is based on the following relevant filings: The FCC's Motion for Protective
Order, ECF No. 21 ("Mot. for Prot. Order") and related exhibits, including the Declaration of
Sarah Citrin, ECF No. 21-3 ("Citrin Decl."); the FCC's Revised Vaughn Index, ECF No. 23-1
("2d Vaughn Index"); two declarations by FCC Senior Counsel Christopher Santini, ECF Nos.
14-1 ("July Santini Decl.") and 23-2 ("Nov. Santini Decl."); Ms. Wilson's Memorandum in
Support of her Motion for Summary Judgment, ECF No. 25-1 ("Pl. Mem."), the related exhibit,
and the supporting Statement of Material Facts, ECF No. 25-3 ("Pl. Fact Stmt."); the FCC's

Court DENIES Ms. Wilson's first motion for summary judgment (ECF No. 15), as moot, DENIES WITHOUT PREJUDICE Ms. Wilson's amended motion for summary judgment (ECF No. 25) and the FCC's cross-motion for summary judgment (ECF No. 26), and GRANTS IN PART the FCC's Motion for Protective Order (ECF No. 21).

## BACKGROUND

In 2017, Sinclair and Tribune announced their intent to transfer control of Tribune's television stations to Sinclair for $3.9 billion. *See* FCC Fact Stmt. ¶ 1; Pl. Mem. at 4. The transaction would have made Sinclair "the nation's largest broadcaster, with [control of] as many as 233 stations across the country." *In the Matter of Sinclair Broad. Grp.*, 35 FCC Rcd. 5877, 5897 (2020) (hereafter "Consent Decree") (Statement of Commissioner Rosenworcel, dissenting).

FCC approval was required to complete the transfer, so on June 28, 2017, Sinclair and Tribune filed applications with the agency. *See* FCC Fact Stmt. ¶ 1. The applications were later amended to include divestiture proposals for three Tribune stations. *Id.* ¶¶ 2–4. The divestitures made economic sense to Sinclair, *see* Shapiro Decl. ¶ 3(b), and were also likely influenced by the FCC's multiple ownership rules, which govern the number of stations a company can control in a market as well as the total number of stations a company can control nationwide. *See* Pl. Mem.

---

Memorandum in Support of its Motion for Summary Judgment, Opposition to Plaintiff's Motion for Summary Judgment, and Reply in Support of a Protective Order, ECF No. 26 ("FCC Mem."), the related exhibits and declarations, including the Declarations of Scott Shapiro, ECF No. 26-1 ("Shapiro Decl."), Barbara Kreisman, ECF No. 26-2 ("Kreisman Decl."), and Sima Nilsson, ECF No. 26-3 ("Nilsson Decl."), and the FCC's Statement of Material Facts, ECF No. 26-6 ("FCC Fact Stmt."); Ms. Wilson's Opposition Memorandum, ECF No. 29 ("Pl. Reply") and supporting exhibit; and the FCC's Reply, ECF No. 30 ("FCC Reply"). Throughout, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (e.g., *1), in which case the reference is to the pagination assigned by PACER/ECF.

at 4–5; Nov. Santini Decl. ¶ 10.  Under the divestiture proposal, Sinclair would have sold KDAF (a Dallas station) and KIAH (a Houston station) to Cunningham Broadcast Corporation for $60 million.  *See* FCC Fact Stmt. ¶ 3; Pl. Mem. at 4.  Sinclair would have sold WGN-TV (a Chicago station) to WGN-TV LLC, a company owned by Steven Fader, for $60 million.  *See* FCC Fact Stmt. ¶ 4; Pl. Mem. at 4.

The proposed deals attracted significant public scrutiny.  Journalists, including Ms. Wilson, reported on Sinclair's plans, suggesting that Sinclair was attempting to use "front companies" to circumvent FCC ownership rules.  *See* Pl. Mem. at 4–5.  Among other things, Ms. Wilson pointed out the close relationships between Sinclair executives and the company's proposed divestiture partners, Cunningham Broadcast and Steven Fader.  *See id*.  In response to these and similar allegations, the FCC designated the Sinclair-Tribune transfer applications for hearing before an administrative law judge.  *See* FCC Fact Stmt. ¶¶ 5–6; July Santini Decl. ¶ 7.  The purpose of the hearing was to determine whether Sinclair was the real party-in-interest in the proposed KDAF, KIAH, and WGN-TV divestitures and whether Sinclair had made misrepresentations or lacked candor in its communications to the FCC.  *Id.*; *see also* Consent Decree at 5877 ¶ 2, 5882–83 ¶ 4.  The agency also expressed concerns about the proposed divestiture sales prices, which appeared to be below market value.  *See* Pl. Mem. at 5–6 (citing *In the Matter of Applications of Trb. Media Co. & Sinclair Broad. Grp., Inc.*, 33 FCC Rcd. 6830 (2018) (statement by Commissioner O'Rielly)).

Seeking to resolve the agency's concerns outside the context of the (public) hearing, on July 31, 2018, Sinclair voluntarily submitted to the FCC's Enforcement Bureau information and documents related to the proposed deals and divestitures.  *See* July Santini Decl. ¶ 8; FCC Fact Stmt. ¶ 7; Pl. Fact Stmt. ¶ 3.  Sinclair requested that the information be treated as confidential,

because its communication was prepared for settlement negotiations and the supporting documents included commercially sensitive financial information, including about how Sinclair valued stations. *See* July Santini Decl. ¶ 8; FCC Fact Stmt. ¶¶ 8–9. Sinclair supplemented its communication on May 3, 2019, again requesting that the submitted documents be treated as confidential to protect commercially sensitive financial information. *See* July Santini Decl. ¶ 8; FCC Fact Stmt. ¶¶ 10–11; Pl. Fact Stmt. ¶ 3. Through a letter of inquiry ("LOI"), the FCC in June 2019 requested additional information and documents about Sinclair's commercial dealings and station valuations. *See* July Santini Decl. ¶ 9; FCC Fact Stmt. ¶¶ 12–13; *see also* Ex. 1 to Pl. Mem., ECF No. 25-2 at *3–11 (copy of the LOI). Sinclair responded with additional documents on July 11 and August 6, 2019, again requesting confidential treatment because the documents contained commercially sensitive financial information. *See* July Santini Decl. ¶ 10; FCC Fact Stmt. ¶¶ 15–16; Pl. Fact Stmt. ¶ 4.

The FCC reviewed Sinclair's submissions and, satisfied that they described in detail the company's proposed transaction agreements, agreed to enter a consent decree. *See* July Santini Decl. ¶ 11; FCC Fact Stmt. ¶ 18; Pl. Fact Stmt. ¶ 2. The Consent Decree concluded that Sinclair had structured its proposed transactions based on a good faith interpretation of the FCC's rules, resolved the issues designated for (public) hearing, required Sinclair to develop and implement a plan ensuring future compliance with FCC rules, and ordered Sinclair to pay a $48 million civil penalty. *See* July Santini Decl. ¶ 11; FCC Fact Stmt. ¶¶ 17–19; Pl. Fact Stmt. ¶ 2; Consent Decree at 5887 ¶ 20, 5892 ¶ 24. Significantly, the Consent Decree described Sinclair's submission of documents to the agency but not their precise contents. *See* Consent Decree at 5883 ¶ 7.

Ms. Wilson wants the documents Sinclair submitted to the FCC.  She maintains that, "[h]ad the FCC followed the commands of the Communications Act [of 1934, 47 U.S.C. §§ 151 *et seq*.,] and its rules, Sinclair's conduct would have been probed in an evidentiary hearing and the documents in question would have been part of the hearing record."  Pl. Mem. at 3.  She insists that the FCC and Sinclair "should not be permitted to hide documents by resort to a nonpublic, ex parte process, especially when [the documents] are the sole basis for the FCC's resolution of substantial and material questions of fact that it had previously said required a public hearing."  *Id*.  She accordingly filed a request under the Freedom of Information Act ("FOIA") on October 28, 2020, seeking:

> All documents or filings Sinclair submitted to the FCC or its Bureaus, (as referenced in the Consent Decree, paragraph 7), on July 31, 2018[;] May 2, 2019[;] July 12, 2019[;] and August 6, 2019 and any supplements thereto.

Ex. 2 to Pl. Mem., ECF No. 25-2, at *14; *see also* Pl. Fact Stmt. ¶ 5; FCC Fact Stmt. ¶¶ 20–21; Citrin Decl. ¶¶ 3–5; July Santini Decl. ¶¶ 12–13.  Pursuant to FOIA, upon a reasonably descriptive request for records submitted in compliance with agency procedures, the agency "shall make the records promptly available" except in certain circumstances or if an exemption applies.  5 U.S.C. § 522(a)(3)(A), (b).  To fulfill this obligation, the FCC delegated the task of responding to Ms. Wilson's request to its Media Bureau.  *See* Citrin Decl. ¶ 3; July Santini Decl. ¶ 12.

The Media Bureau then began the work of identifying responsive records and determining whether they should be released or withheld under any of FOIA's exemptions.  *See* Citrin Decl. ¶ 6.  After locating some responsive records, in January 2021, the FCC notified Sinclair of Ms. Wilson's FOIA request and asked the company to state its objections, if any, to disclosure of responsive records.  *Id.* ¶ 8.  Sinclair promptly informed the agency that it objected

to disclosure of all but seven of the documents and asserted that those seven documents were exempt from disclosure under FOIA Exemption 4.  *Id.* ¶ 9.  Exemption 4 permits the agency to withhold from public disclosure documents that reflect "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  Ms. Wilson responded to the objection, prompting the Media Bureau to independently review the materials.  *See* Citrin Decl. ¶¶ 10–11.

Two months later, the FCC had not completed its review and Ms. Wilson had not received any substantive agency response to her FOIA request.  *See* Compl., ECF No. 1, ¶¶ 8–13.  She accordingly filed this suit under 5 U.S.C. § 552(a)(4)(B) and requested an order commanding the FCC to "process immediately" her request and make available to her copies of responsive records.  *Id.* ¶¶ 4, Prayer for Relief.  The summons and complaint were served on May 5, 2021, *see* ECF No. 9 at *2, and, the same day, the FCC's Media Bureau released to Ms. Wilson 261 pages of documents it determined were responsive to her request and not confidential.  *See* Citrin Decl. ¶ 11.  The agency withheld the remainder of the discovered responsive materials under FOIA Exemption 4.  *Id*.  The FCC then filed its Answer to Ms. Wilson's Complaint, and Ms. Wilson moved for summary judgment.  *See* ECF Nos. 11, 15.

Seeking to narrow the scope of the dispute, FCC staff then conducted an additional review of documents responsive to Ms. Wilson's FOIA request.  *See* Citrin Decl. ¶ 13.  This second review revealed to the agency additional non-confidential documents as well as portions of documents that could be segregated from the confidential information the agency claimed was exempt from disclosure under FOIA Exemption 4.  *Id*.  The FCC again contacted Sinclair to obtain the company's position on the proposed additional disclosures.  *Id.* ¶ 14.  To aid in Sinclair's review, the agency highlighted portions of the documents that the FCC proposed to

continue to withhold.  *Id*.  Sinclair responded by maintaining that there were "firm legal grounds" to withhold "in their entirety" documents responsive to Ms. Wilson's FOIA request, but to "cooperate" with the agency, Sinclair limited its objections to the release of four "specific items" contained in the company's response to the FCC's June 2019 LOI.  *Id.* ¶ 17; *see also* Ex. 5 to Mot. for Prot. Order, ECF No. 21-5 (copy of Sinclair's letter).  According to the FCC, Sinclair's continued objections did not reach any of the additional material that the FCC proposed to release.  *See* Citrin Decl. ¶ 17.

The agency then prepared a supplemental production to Ms. Wilson's FOIA request.  *Id.* ¶ 18.  In preparing the production, FCC staff converted most of the highlighted portions of the material (marking for Sinclair's review information that the agency intended to continue to withhold) into redactions.  *See id.* ¶¶ 18–20.  One highlighted paragraph—the last paragraph of Sinclair's May 2019 submission to the FCC—was not successfully converted.  *See id*.  That paragraph described how Sinclair determined its proposed divestiture resale price for stations KDAF and KIAH.  *See id.* ¶ 24; Nov. Santini Decl. ¶¶ 10–12.  The FCC also failed to redact a sentence it had highlighted in Sinclair's July 2019 response to the LOI that explained how Sinclair proposed to control WGN-TV after the station was divested to WGN-TV LLC.  *See* Nov. Santini Decl. ¶ 13.  Accordingly, when attorneys transmitted the additional production to Ms. Wilson's attorney via email in the late afternoon on Friday, October 22, 2021, the sentence about WGN-TV in Sinclair's July 2019 LOI response and the last paragraph of Sinclair's May 2019 submission remained highlighted instead of redacted, and the information reflected there, which the FCC maintains is exempt from disclosure under FOIA Exemption 4, was inadvertently disclosed.  *See* Citrin Decl. ¶¶ 21–24; Nov. Santini Decl. ¶¶ 9–13.

Agency staff learned of the mistake later that evening.  Around 7:50 p.m. EDT, Media

Bureau staff forwarded a courtesy copy of the production to Sinclair.  *See* Citrin Decl. ¶ 23.  At

8:38 p.m. EDT, Sinclair alerted the FCC that the last paragraph of its May 2019 submission was

highlighted in the production to Ms. Wilson.  *Id.* ¶ 24.  At 11:03 p.m. EDT, an attorney in the

FCC's Office of General Counsel emailed Arthur Belendiuk, counsel for Ms. Wilson, to advise

him of the inadvertent disclosure.  *Id.* ¶¶ 1, 25.  Agency counsel asked Mr. Belendiuk to discard

the production without reviewing or sharing it and to confirm that he had done so.  *Id.* ¶ 25.  He

was advised he would then be given a replacement production with corrected redactions.  *Id*.

Mr. Belendiuk did not initially respond, and the FCC sent its replacement production the

following Monday, October 25.  *See id.*; Nov. Santini Decl. ¶ 14.  The replacement production

included 25 full, unredacted pages of previously withheld materials.  *See* Nov. Santini Decl. ¶ 15.

Also included were 74 pages of partially redacted documents, which the FCC maintains are

protected from further disclosure by FOIA Exemption 4.  *Id.* ¶ 16.  The FCC continued to

withhold in full four documents that it insists contain confidential commercial information not

reasonably segregable from nonconfidential information also in the documents.  *Id.* ¶ 17.

Still having received no response from Mr. Belendiuk, the FCC reached out again

regarding the inadvertent disclosures the next day at 11:53 a.m. and 5:32 p.m. EDT.  *See* Mot.

for Prot. Order at 5 (citing exhibits 10 and 11, ECF Nos. 21-10 & 21-11).  At 5:42 p.m., Mr.

Belendiuk responded: "After conferring with my client, the decision was made not to delete the

documents sent on Friday."  *Id.* (quoting exhibit 12, ECF No. 21-12).  The parties alerted the

Court to the disclosure and clawback dispute later that week, advising that Ms. Wilson planned

to use the inadvertently disclosed materials unless the FCC moved for a protective order by

November 5, 2021.  *See* Jt. Status Rep., ECF No. 20.

The agency filed its request for protective relief in keeping with that agreement.  *See* Mot. for Prot. Order.  In response, on November 5, 2021, the Court ordered Ms. Wilson not to disclose, disseminate, or make use of the inadvertently disclosed information "unless and until this Court orders otherwise."  Order at 1, ECF No. 22.  The Court also directed the parties to submit a briefing schedule addressing both the FCC's protective order request and Ms. Wilson's pending motion for summary judgment.  *Id.* at 2.  A briefing schedule was entered on November 16, 2021, after which Ms. Wilson re-filed her request for summary judgment with an updated motion and memorandum, *see* ECF No. 25, and the agency responded with a cross-motion for summary judgment and its own memoranda and exhibits in support.  *See* ECF No. 26.  The motions for a protective order and for summary judgment are now fully briefed and the parties' disputes are ripe for resolution.

## LEGAL STANDARD

### I.     Motion for Summary Judgment

Federal courts will grant summary judgment in favor of a movant who shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When more than one party moves for summary judgment, each party must carry its own burden of proof."  *Pub. Citizen*, 953 F. Supp. at 402.  In a FOIA case, that burden can be carried "solely on the basis of agency affidavits if they are clear, specific[,] and reasonably detailed, and there is no contradictory evidence in the record," *id.* (internal quotation omitted), and so long as there is no evidence "of agency bad faith."  *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013).  "However, since summary judgment is . . . a 'drastic remedy, courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue.'"  *Pub. Citizen*, 953 F. Supp. at 402 (quoting *Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986)).

## II.        Motion for Protective Order

FOIA does not provide for protective orders or the compelled return or destruction of inadvertently produced documents.  *See generally* 5 U.S.C. § 552.  "Nevertheless, federal courts have long 'understood that certain implied powers must necessarily result to our Courts of justice from the very nature of their institution,' which 'are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Sierra Club v. U.S. Env't Prot. Agency*, 505 F. Supp. 3d 982, 988–89 (N.D. Cal. 2020) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).  Courts have used that implied power to bar dissemination of information inadvertently disclosed in FOIA proceedings.  *See, e.g.*, *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 953 F. Supp. 400, 404 (D.D.C. 1996); *Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU I*"), No. 09-cv-8071, 2012 WL 13075284, at *5 (S.D.N.Y. Mar. 20, 2012).  A federal court's implied power remains "limited by the necessity giving rise to its exercise," however, and its use must be "a reasonable response to the problems and needs that provoke it."  *Degen v. United States*, 517 U.S. 820, 823–24, 829 (1996).  Whether exercise of that power is appropriate here must be weighed in light of these principles and the insights of other courts that have wrestled with similar questions.

## DISCUSSION

## I.        Summary Judgment

Both parties claim they are entitled to summary judgment on the FCC's withholding decisions under FOIA Exemption 4.  Because Ms. Wilson filed both an original and an amended motion for summary judgment, her first-filed motion, ECF No. 15, is DENIED as MOOT.  Her amended summary judgment motion, ECF No. 25, is DENIED.  The FCC's cross-motion for summary judgment, ECF No. 26, is also DENIED, for the reasons that follow.

### A.     *In Camera Review*

Before addressing the legality of the FCC's withholding decisions, the Court must first address the adequacy of the agency's affidavits and determine whether *in camera* review of the withheld material is necessary or appropriate.  *See Pub. Citizen*, 953 F. Supp. at 402; *Meeropol v. Meese*, 790 F.2d 942, 958 (D.C. Cir. 1986).  Ms. Wilson insists that the Court cannot rely on the FCC's Vaughn Index or supporting declarations because the FCC "acted in bad faith and has failed to discharge its obligations under FOIA."  Pl. Mem. at 14.  She notes that the FCC initially withheld three "pro forma confidentiality requests" received from Sinclair and a "parental disclosure letter" Sinclair attached to its July 2019 response to the FCC's LOI.  *See id.* at 12–13.  At the time those documents were withheld, the FCC claimed that the parental disclosure letter was not segregable from confidential financial information in Sinclair's LOI response.  *See id.* at 13 (citing the July Santini Decl. and the FCC's first Vaughn Index, ECF No. 14-2, at 3).  The agency later revised that position—a matter addressed in more detail below.  The three confidentiality requests were simply "overlooked."  Nilsson Decl. ¶¶ 8–9.

The agency later produced all four documents in their entirety.  *See id.* at 14–15; *see also* Nov. Santini Decl. ¶ 15.  According to Ms. Wilson, that later production demonstrates that the FCC improperly withheld the documents in the first instance, misrepresented itself in its initial Vaughn Index and supporting affidavit, and therefore acted in bad faith.  *See* Pl. Mem. at 11–15.  At the very least, she suggests that the FCC's affidavits are untrustworthy because agency representatives proclaimed under penalty of perjury that agency officials had reviewed responsive materials "document-by-document and line-by-line," and yet overlooked these documents that should clearly have been disclosed.  *Id.* at 12 (citing July Santini Decl. ¶ 26).  The implication, in other words, is that the agency's initial withholding justifications were

wrong, "from which it follows that the agency is fallible and its affidavits suspect." *Mil Audit Project v. Casey*, 656 F.2d 724, 754 (D.C. Cir. 1981); *see also* Pl. Mem. at 11–15.

The FCC responds with caselaw suggesting that, standing alone, an agency's voluntary reevaluation and revision of FOIA withholdings is no reason to infer that the agency acted in bad faith or that its affidavits are suspect. *See* FCC Mem. at 26–27 (citing *Mil. Audit Project*, 656 F.2d at 754; *Am. Civil Liberties Union v. Dep't of Def.* ("*ACLU II*"), 628 F.3d 612, 627 (D.C. Cir. 2011); *Skybridge Spectrum Found. v. FCC*, 842 F. Supp. 2d 65, 77 n.3 (D.D.C. 2012)). Updated affidavits from the agency explain that FCC legal advisors reviewed the memorandum Ms. Wilson submitted in support of her initial motion for summary judgment, at which point agency staff "realized" that Sinclair's confidentiality requests were responsive to Ms. Wilson's FOIA request and had been omitted from the initial production. Nilsson Decl. ¶¶ 10–14. The agency also sought to "narrow the scope of the parties' dispute" and so reassessed whether it was possible to segregate and release additional material Sinclair submitted to the FCC. *Id.* ¶ 13. The agency decided that the parental disclosure attached to Sinclair's July 2019 LOI response was so segregable, then produced the additional files and prepared updated affidavits explaining what had been produced and withheld, when, and why. *See generally id*. Ms. Wilson responds that, "[w]hether inadvertent or intentional," the agency's actions should raise legitimate doubts that the Court can rely on the FCC's representations. *See* Pl. Reply at 21.

"A judge hearing a claim under FOIA is not obligated to conduct an *in camera* review of the documents withheld; the decision to do so is discretionary." *Meeropol*, 790 F.2d at 958 (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). Courts use that discretion to satisfy any "uneasiness" or to resolve doubts about the character of withheld material before "tak[ing] responsibility for a de novo determination" that an agency's

withholding decisions were proper. *Id.* (internal quotations omitted).  The "inadequacy" of previous withholding justifications has supported other courts' decisions to conduct *in camera* reviews. *See id.*  Yet the D.C. Circuit has "emphatically" rejected any uniform rule that a corrected disclosure is cause for alarm. *Mil. Audit Project*, 656 F.2d at 754.  Courts in the D.C. Circuit must instead weigh "the particular circumstances" of each case to determine whether *in camera* review is necessary. *Skybridge*, 842 F. Supp. 2d at 77 n.3.

In *Skybridge*, a case similar to this one, the court found agency affidavits were sufficient and that no further review of withheld materials was necessary after the agency made additional disclosures of segregable information discovered in the process of preparing a motion for summary judgment. *See id.* at 74, 77.  The circumstances present here do not warrant a different result.  This Court is satisfied that the agency's updated Vaughn Index and affidavits are sufficiently detailed, reliable, and untainted by evidence of government bad faith, and will not order *in camera* review.

### B.    FOIA Exemption Four

Based on the parties' affidavits and the agency's Vaughn Index, the Court must next examine "de novo" whether the FCC properly withheld materials under FOIA Exemption 4. 5 U.S.C. § 552(a)(4)(B).  Exemption 4 permits a government agency to protect from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  The burden is on the FCC to prove that the claimed exemption applies. *See ACLU II*, 628 F.3d at 619.  Exemptions are "narrowly construed," *FBI v. Abramson*, 456 U.S. 615, 630 (1982), but within that narrow construction, the agency's "justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  The agency must also demonstrate that it "reasonably foresees that disclosure" of the withheld information "would

harm an interest protected by an exemption."  5 U.S.C. § 552(a)(8)(A)(i).  These rules permitting

withholding should "not obscure the basic policy that disclosure, not secrecy, is the dominant

objective" of FOIA.  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

Several of the Exemption 4 considerations are not presently in dispute.  The FCC has not

suggested that the materials withheld from Ms. Wilson are "trade secrets" or "privileged."  *See*

*generally* 2d Vaughn Index; Nov. Santini Decl. ¶ 18.  The agency describes the withheld

documents as confidential "commercial or financial information" concerning the market value

and proposed sale prices for various broadcast stations, negotiations and possible structures for

divestiture deals, and discussions surrounding the planned Sinclair-Tribune transaction.  *See id*.

This kind of information fits snugly within the "ordinary meanings" of the terms "commercial"

and "financial," *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir.

1983) (adopting that construction for FOIA Exemption 4), and Ms. Wilson does not seriously

contend otherwise.[2]  *See* Pl. Mem.; Pl. Reply.  Additionally, Ms. Wilson specifically requested

"documents or filings Sinclair submitted to the FCC or its Bureaus."  Pl. Fact Stmt. ¶ 5; FCC

Fact Stmt. ¶¶ 20–21.  Any responsive documents must therefore have been "obtained from a

person."  5 U.S.C. § 552(b)(4); *see also Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*,

117 F. Supp. 3d 46, 63 (D.D.C. 2015) (confirming that corporations are "persons" within the

_____

[2] Two exceptions are Sinclair's July 31, 2018 letter "submitted . . . for consideration of a settlement agreement" and Sinclair's "Summary of Response to Issues Raised in the Hearing Designation Order," a document drafted by Sinclair and sent to the agency as part of the company's May 3, 2019 communication.  *See* Vaughn Index at 1; Pl. Mem. at 29, 31.  Ms. Wilson suggests these documents were improperly withheld because settlement negotiations are not protected by FOIA Exemption 4—the only exemption claimed by the FCC.  *See* Pl. Mem. at 29, 31.  The FCC did not withhold these documents in their entirety, however; both were released with redactions which the agency says shield from disclosure only confidential commercial information.  *See* Nov. Santini Decl. ¶ 19.  Ms. Wilson does not raise a separate argument regarding segregablility, so the redacted information is addressed more generally alongside the agency's other withholdings.

meaning of FOIA Exemption 4).  The only remaining issues, then, are whether the withheld

information is "confidential" within the meaning of 5 U.S.C. § 552(b)(4) and whether the FCC

"reasonably foresees that disclosure" of the information "would harm an interest protected by an

exemption."  5 U.S.C. § 552(a)(8)(A)(i).

### 1.    *The Withheld Information Is Confidential.*

Commercial or financial information is "confidential" within the meaning of FOIA

Exemption 4 "at least" where the information "is both [(i)] customarily and actually treated as

private by its owner and [(ii)] provided to the government under an assurance of privacy." *Food

Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).  The first condition—that the

information be "customarily kept private, or at least closely held, by the person imparting it"—is

mandatory. *Id.* at 2363.  The second condition—the government's assurance of privacy—is

relevant but not strictly required. *See id.* (declining to decide whether the second condition is

mandatory); *Stotter v. U.S. Agency for Int'l Dev.*, No. 14-cv-2156, 2020 WL 5878033, at *5

(D.D.C. Oct. 3, 2020) (describing as "clear beyond cavil" that an agency's privacy assurances

are "relevant"); *Shapiro v. Dep't of Just.*, No. 12-cv-313, 2020 WL 3615511, at *26 (D.D.C. July

2, 2020), *reconsideration denied*, 2020 WL 5970640 (D.D.C. Oct. 8, 2020) (same).  *But cf.

Renewable Fuels Ass'n v. Env't Prot. Agency*, 519 F. Supp. 3d 1, 12 (D.D.C. 2021) (suggesting

D.C. Circuit precedent may affirmatively prohibit application of the second condition, citing

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992)).

### i.    *The Information Is Customarily and Actually Treated as Private.*

The first confidentiality condition is satisfied in this case.  The FCC says Sinclair

provided all the information the agency has withheld from Ms. Wilson under cover of

confidentiality requests and that the company does not typically make any of the information

public. *See* 2d Vaughn Index; July Santini Decl. ¶¶ 22, 24; Nov. Santini Decl. ¶ 7; FCC Mem. at

15–16 (collecting additional citations).  That assessment is based on representations Sinclair

made to the FCC about its policies and practices in its requests for confidentiality, as well as

Sinclair's responses to emails from the FCC regarding the company's objections, if any, to the

disclosure of documents responsive to Ms. Wilson's FOIA request.  *See* July Santini Decl. ¶¶ 22,

24; Nov. Santini Decl. ¶¶ 5–7; *see also* Exs. 4, 5 to Mot. for Prot. Order, ECF Nos. 21-4, 21-5

(copies of Sinclair's disclosure objection letters); Shapiro Decl. ¶¶ 3–9.

      Ms. Wilson disagrees that the information she seeks is customarily or actually treated as

private.  She advances three theories.  Her first is that, had the public hearing about the Sinclair-

Tribune deal and related issues gone forward, "most if not all of [the] documents [she] seeks

would have been made part of the hearing record."  Pl. Mem. at 23.  But there is no way to know.

This Court cannot assume into existence facts about the documents Sinclair would have prepared

or produced in the context of a hearing that ultimately did not take place.  FCC administrative

law judges can moreover issue protective orders shielding confidential commercial or financial

information from public disclosure.  *See* FCC Mem. at 22 (citing 47 C.F.R. § 1.314).  Even if

Sinclair had produced some of the information Ms. Wilson seeks in a public hearing, then, that

information still may have been withheld from the public under the FCC's rules.  Ms. Wilson's

first theory thus falls short.

      Ms. Wilson's remaining theories relate to the kinds of information broadcast companies

must routinely disclose to the FCC and public to comply with agency regulations.  She draws

attention to Sinclair's answers to LOI questions about the company's loan guarantees and other

financial agreements with WGN-TV LLC and Cunningham Broadcast.  *See* Pl. Mem. at 26.

These documents, she says, must be included with a broadcast company's biennial ownership

report, which itself must be maintained for public inspection consistent with agency rules.  *See id.* at 27 (citing 47 C.F.R. §§ 73.3615, 73.3613, 73.3526(e)(5)).

The cited regulations do not support Ms. Wilson's point.  Section 73.3526(e)(5) requires a commercial broadcast television station licensee to maintain and make available for public inspection a copy of its most recent ownership report and ownership-related contracts, but the rule expressly permits licensees to redact "confidential or proprietary information."  47 C.F.R. § 73.3526(e)(5); *see also* Kreisman Decl. ¶ 12 (describing redaction rules before January 2019).  Whether the withheld information is "confidential" is at the heart of this dispute, so a rule permitting the company to withhold from the public "confidential" information settles nothing.

Ms. Wilson also points to an agency regulation that requires licensees to submit biennial ownership reports to the FCC consistent with the "requirements set forth in . . . FCC Form 323." 47 C.F.R. § 73.3615(a).  The instructions to FCC Form 323 warn filers not to attach to the form copies of contracts or instruments.  *See* Ex. 2 to FCC Mem., ECF No. 26-5, at 5, 10.  Those documents must be provided to the FCC "within seven days of a request by the FCC," *see id.* at 10, but nothing in the Form 323 instructions or FCC regulations suggests that the agency will routinely make documents it receives through this provision available for public inspection.  *See id.*; 47 C.F.R. § 73.3613; *see also* FCC Mem. at 21.  There is accordingly no reason to believe that Sinclair's biennial ownership reports customarily or actually include draft or not-yet-executed commercial arrangements with third parties, as Ms. Wilson suggests.

Ms. Wilson's third theory relates to Sinclair's obligations under 47 C.F.R. § 73.3540. *See* Pl. Mem. at 23–27; Pl. Reply at 4–8.  That agency rule requires companies to apply to the FCC for approval of proposed station transfers (among other things), and mandates that companies make numerous representations in their applications, usually on FCC Forms 314 or

315. *See* 47 C.F.R. § 73.3540(d); *see also* Kreisman Decl. ¶ 6.  Regulations also require

companies to maintain a "copy of any application tendered for filing with the FCC, together with

all related material," in a file available for public inspection.  47 C.F.R. § 73.3526(e)(2).  Ms.

Wilson theorizes that, consistent with these rules, Sinclair would have been required to disclose

and maintain for public inspection both the company's commercial agreements with

Cunningham Broadcast and WGN-TV LLC, *see* Pl. Mem. at 26, and information about Sinclair's

"control [of] the programming, personnel, and finances of station WGN-TV" had that station

been divested to WGN-TV LLC.  *Id.* at 24 (quoting the FCC's LOI, ECF No. 25-2 at *5).  She

concludes that Sinclair would not, therefore, customarily keep the information private, and the

information is accordingly not confidential within the meaning of FOIA Exemption 4.  *See id*.

     Whether the FCC's rules and form applications for station transfers would have required

Sinclair to disclose the contested information is an open question that cannot be resolved on

summary judgment.[3]  Ultimately, the issue is not material.  Confidentiality under FOIA

---

[3] The FCC says that its forms do not require transferor applicants to disclose detailed information about post-transfer station control or commercial agreements with transferees.  *See* FCC Mem. at 19–21; Kreisman Decl. ¶¶ 6–10.  Ms. Kriesman's affidavit might ordinarily settle the matter.  *See Jud. Watch, Inc. v. U.S. Dep't of Justice*, 185 F. Supp. 2d 54, 63 (D.D.C. 2002).  But there is contrary evidence in the record suggesting that FCC Form 315, used when a company seeks agency approval for a voluntary transfer, may sometimes require more.  The Instructions for Form 315 require transfer parties to make numerous representations to the agency, including about the parties' interests, future ownership rights, and "non-party" influence over licensee operations.  *See* Ex. 1 to FCC Mem., ECF No. 26-4, at *14–20 ¶ E, *32–48; *see also* Pl. Reply at 4–8 (providing additional citations).  Depending on the representations made, the parties may be required to submit exhibits further explaining their answers or the parties' compliance with agency regulations.  *See, e.g.*, *id.* at *41 (requiring, depending on representations made, copies of certain transferor-transferee financial agreements to demonstrate compliance with agency rules); *id.* at *47 (requiring, depending on representations made, submission of "an exhibit detailing the rights of any non-party investor and setting forth fully the applicant's reasons for not treating the investor as a party to the application"); *id.* at *63 (requiring certification regarding "equity and financial interests" not otherwise disclosed and providing space for an exhibit).  In some circumstances, then, Form 315 would seem to require disclosure of fairly detailed information about transferor and transferee interests, financial

Exemption 4 is a matter of how the owner of withheld information customarily treats the information, "not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001). Even if Ms. Wilson is correct that *every other* broadcast company would have submitted detailed information about the future control of planned divestiture stations, either generally or under the circumstances surrounding the proposed Sinclair-Tribune deal, or whether copies of Sinclair's financial agreements with its commercial partners were or should have been required by the rules, at the end of the day, Sinclair did not publicly disclose any of that information. *See* Pl. Mem. at 24–25; July Santini Decl. ¶¶ 6–10; Shapiro Decl. ¶¶ 3–4. Sinclair only shared the information with the FCC under cover of confidentiality requests. *See* July Santini Decl. ¶¶ 8–10; Shapiro Decl. ¶¶ 3–4. There is thus no reason to think that Sinclair "customarily" or "actually treated" this or any other information withheld from Ms. Wilson by the FCC as anything other than private. The information is therefore "confidential" within the meaning of FOIA Exemption 4.

> ii.    *The Government Did Nothing To Suggest that Sinclair's Private Information Would Not Be Treated As Confidential.*

---

arrangements, and control over transferred stations—information beyond the yes/no certifications and identities of parties to the transaction described by Ms. Kriesman. *Compare id. with* Kriesman Decl. ¶¶ 6–10. This is no small matter. The amount of information required by the FCC's rules is central to Ms. Wilson's larger theory of this case. She contends that Sinclair declined to disclose to the FCC sufficient information about its proposed deal with Tribune and the related station divestitures, prompting the FCC to set for public hearing both the question of Sinclair's continued interest in and control over the divestiture stations and the underlying issue of Sinclair's candor to the FCC. *See* Pl. Mem. at 2–4, 24–26; Pl. Reply 4–8. The agency later decided not to pursue those questions in the context of a public hearing. *See* Pl. Fact Stmt. ¶ 2; FCC Fact Stmt. ¶¶ 17–19. Ms. Wilson casts this as a sort of "regulatory capture" that the Court should not condone. *See* Pl. Mem. at 12. That is not, however, the issue before the Court. The present question is whether the FCC properly withheld information that Sinclair did not make public, and which the agency did not require Sinclair to make public, from public inspection under FOIA Exemption 4.

The second confidentiality factor—the government's assurance of privacy—is not required but is "relevant to determining whether [commercial or] financial information that is shared with the government is 'confidential' pursuant to the FOIA's Exemption 4." *Stotter*, 2020 WL 5878033, at *5. Courts in this Circuit have declined to "read the word 'confidential' to impose a blanket requirement that the government provide an assurance of privacy in every case in which it asserts Exemption 4," in part because doing so would prompt "many fairly arbitrary disputes over whether such an assurance can be implied." *Renewable Fuels*, 519 F. Supp. 3d at 12. If anything, courts here have taken the position that "privately held information is generally confidential absent an express statement by the agency that it would *not* keep information private, or a clear implication to that effect (for example, a history of releasing the information at issue)." *Id.* at 12–13 (emphasis and parenthetical original); *see also, e.g.*, *Human Soc'y of U.S. v. Dep't of Agric.*, 549 F. Supp. 3d 76, 91 (D.D.C. 2021) (applying this approach).[4]

Under FCC rules, when an outside entity submits materials to the agency together with a confidentiality request, *see* 47 C.F.R. § 0.459, "the materials will not be made routinely available for inspection" by the public "[i]f it is shown in the request that the materials contain . . . confidential commercial, financial or technical data." *Id.* § 0.457(d)(2). A member of the public who wishes to inspect such materials must make "a persuasive showing as to the reasons for inspection," which the agency evaluates under its FOIA regulations. *Id.* Sinclair requested

---

[4] Ms. Wilson argues that "[o]ther courts have held that Exemption 4 *requires* [a governmental] assurance [of privacy]," citing several cases. *See* Pl. Reply at 10 & n.16 (emphasis added). Some of those cases are addressed in the body of this opinion. Others supporting the proposition rely on non-D.C. Circuit precedent. *See, e.g.*, *Pub. Just. Found. v. Farm Serv. Agency*, 538 F. Supp. 3d 934, 942 (N.D. Cal. 2021) (deciding confidentiality issue not on the basis of *Argus Leader* but on the 9th Circuit's "*Benson* standard," from *Gen. Servs. Admin. v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969)). The cited cases are not binding, and as they apply law not applicable here, they are also not persuasive to this Court.

confidential treatment under these provisions for each of its four submissions to the FCC at issue in this case.  *See* July Santini Decl. ¶¶ 8, 10; Nilsson Decl. ¶ 4.  As Ms. Wilson points out, *see* Pl. Reply at 11, there was no *guarantee* the agency would grant the requests.  *See In re Sofio*, 32 FCC Rcd 1781 (2017) (affirming partial denial of a confidentiality request under 42 C.F.R. § 0.459).  But the agency's regulations are enough to show that the FCC advertised that confidentiality was available to Sinclair if Sinclair followed appropriate procedures, and Sinclair followed the procedures.  *See* July Santini Decl. ¶¶ 8, 10.

The FCC then did nothing to indicate it would not honor Sinclair's confidentiality requests.  Rather, the agency signaled the opposite.  Before Ms. Wilson filed her FOIA request, the agency responded to Sinclair's first two voluntary submissions—for which Sinclair requested confidential treatment—with the June 2019 LOI.  *See* July Santini Decl. ¶ 9.  The LOI directed Sinclair to respond to questions and asked Sinclair to state whether it would seek confidential treatment for those responses under 47 C.F.R. § 0.459.  *See id*.  Sinclair submitted its responses along with a request for confidential treatment.  *See id.* ¶ 10.  Then, after Ms. Wilson filed her FOIA request, the agency followed its internal procedure for alerting Sinclair that a member of the public had requested to inspect its materials under 47 C.F.R. § 0.461(d)(3)—a procedure that applies only when a member of the public requests materials "not open to routine public inspection."  *Id.*; *see also* July Santini Decl. ¶ 15.  These actions show that the FCC affirmatively alerted Sinclair to the agency's confidentiality provisions and, once invoked, treated Sinclair's materials as if they were covered by the confidentiality provisions.

Ms. Wilson correctly points out that the FCC can make confidential materials publicly available "if it [is] in the public interest to do so."  Pl. Reply at 11–12; *see also In re Am. Broadband & Telecomms. Co. Jeffrey S. Ansted*, 35 FCC Rcd 3762, 3764 (2020).  She further

asserts that the public interest favors the FCC's release of the information at issue here.  *See* Pl.

Reply at 9–10.  Whether *that* is true is beyond the competence of this Court.  The FCC decided

not to release the information Ms. Wilson seeks, and this Court's role is limited to determining

whether the agency's decision to withhold the information is consistent with FOIA Exemption 4.

The agency's decision to release other information in a past case based on its assessment of the

public and private interests at stake there does not create a "clear implication" that the agency

would release information in this and all future cases involving roughly similar public interests.

*See Renewable Fuels*, 519 F. Supp. 3d at 13.  Accordingly, because the FCC did not indicate to

Sinclair that it would disregard the company's confidentiality requests, and because there is no

evidence that the agency has consistently released similar information in the past, the second

*Argus Leader* consideration—mandatory or merely relevant—is satisfied.  The information Ms.

Wilson seeks is therefore "confidential" within the meaning of Exemption 4.

> ### 2.   *Neither Party Has Met Its Burden as to Reasonably Foreseeable Harm.*

Satisfying the statutory criteria for Exemption 4 "does not end the matter."  *Reps. Comm.*

*for Freedom of the Press v. F.B.I.*, 3 F.4th 350, 369 (D.C. Cir. 2021).  "Under the FOIA

Improvement Act of 2016, the government may not withhold even [exempt] materials unless it

also 'reasonably foresees that disclosure would harm an interest protected by' the FOIA

exemption."  *Id.* (quoting 5 U.S.C. § 552(a)(8)(A)(i)(I)).  The harms protected by Exemption 4

include "genuine harm to [a company's] economic or business interests" and the related harm

that affected companies will be dissuaded "from submitting similar information to the

government" in the future.  *Ctr. for Investigative Reporting v. Customs & Border Prot.*, 436 F.

Supp. 3d 90, 106 (D.D.C. 2019) (internal citations, quotation, and modification omitted); *accord*

*Leopold v. Dep't of Just.*, No. 19-cv-3192, 2021 WL 124489, at *7 (D.D.C. Jan. 13, 2021).  The

agency cannot articulate those harms in a "nebulous," "speculative or abstract," "generalized,"

"boilerplate," or "conclusory" way.  *Investigative Reporting*, 436 F. Supp. 3d at 106; *Reps. Comm.*, 3 F.4th at 369–70.  "[W]hat is needed is a focused and concrete demonstration" that links particular material withheld with particular harms foreseen.  *Reps. Comm.*, 3 F.4th at 370.  This can be accomplished "on a category-by-category basis rather than a document-by-document basis" if the agency groups together like records and explains "the harm that would result from release of each group," so long as the "basis and likelihood of that harm [is] independently demonstrated for each" group or category.  *Id.* at 369 (citing *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)).

Two affidavits describe categories of information withheld by the FCC and harms foreseen by the FCC.  The first is from Sinclair executive Scott Shapiro.  *See* Shapiro Decl. ¶¶ 3, 10–12.[5]  Mr. Shapiro describes five categories of information that could cause harm if disclosed: (a1) broadcast cash flow data for KIAH, KDAF, and WGN-TV, *see id.* ¶ 3a; (a2) Sinclair's economic incentives to divest WGN-TV, *see id.* ¶¶ 3b, 11; (a3) the identities of "Sinclair personnel involved in determining divestiture sales prices," *id.* ¶¶ 3c, 11; (a4) guarantee agreements, *see id.* ¶ 3d; and (a5) information Sinclair "received from Tribune pursuant to agreements intended to preserve confidentiality," *id.* ¶ 10.  The agency's briefs cite almost exclusively to this affidavit when discussing reasonably foreseeable harm.  *See* FCC Mem. at 24–26; FCC Reply at 5–7.

---

[5] FOIA requires "*the agency*" to reasonably foresee harm to an interest protected by an exemption.  5 U.S.C. § 552(a)(8)(A)(i)(I) (emphasis added).  Evidence that a *Sinclair executive* foresaw harm from disclosure would not, therefore, be enough.  The FCC has cured the problem here by adopting Mr. Shapiro's harm assessments as its own.  The declaration of Ms. Kriesman, chief of Video Division in the FCC's Media Bureau, describes how Ms. Kriesman "reviewed" Mr. Shapiro's declaration and, based on her personal knowledge, found credible his "assertions concerning the harm[s] that could foreseeably arise."  *See id.* ¶¶ 1, 15–16.

A second, alternative list of categories of withheld documents is found in the declaration of senior agency counsel Christopher Santini. *See* Nov. Santini Decl. ¶¶ 1, 18. Although the agency does not reference Mr. Santini's declaration in the section of its brief addressing foreseeable harm, Mr. Santini's declaration articulates both categories of information withheld and harms foreseen by the agency. *See id.* ¶ 18. In Mr. Santini's estimation, the categories of withheld information are: (b1) information reflecting negotiations and internal deliberations about Sinclair's planned commercial transactions; (b2) station valuations and supporting documents; (b3) independent appraisals; (b4) broadcast cash flow information; (b5) guarantee agreements; (b6) "proprietary comparable transaction reports"; (b7) information about the private business interests of a Sinclair executive; and (b8) information about Sinclair's "involvement, or lack thereof," in the creation of WGN-TV LLC. *Id.*

There is significant overlap between the two lists. Both describe materials touching on Sinclair's internal assessment of the proposed divestiture deals (categories a2, b1). Both describe materials reflecting broadcast cash flow data and other information used by Sinclair to value stations (categories a1, b2, b4, b6). Both list guarantee agreements in both draft and final form (categories a4, b5). And both list documents prepared for Sinclair's private use by third parties (categories a1, a5, b3).

There are some distinct categories, as well. Mr. Shapiro lists materials that reveal the identity of "specific persons" at Sinclair "primarily responsible" for determining divestiture purchase prices (category a3). Information about Sinclair executives' private business interests (category b7) must be considered separately, too, as must materials reflecting Sinclair's "involvement, or lack thereof," in the creation of WGN-TV LLC (category b8). Comparing the listed categories with the agency's Vaughn Index satisfies the Court that all of the individual

documents or portions of documents withheld from Ms. Wilson are included in one of these groups.

To meet its burden under the FOIA Improvement Act, the agency must next link each category of withheld information to "the harm that would result from release of" that information. *Reps. Comm.*, 3 F.4th at 369.  One harm identified by the agency is a reduction in candid communications from companies—that disclosure of the information withheld from Ms. Wilson "would foreseeably discourage broadcast television companies in future Commission proceedings from sharing useful but sensitive commercial information with the agency." Kriesman Decl. ¶ 16; *see also* FCC Mem. at 26; FCC Reply at 6.  Mr. Shapiro calls this a "chilling effect" triggered by reduced trust in the agency's ability to "prevent public disclosure of . . . confidential information."  Shapiro Decl. ¶ 12; *see also* Kriesman Decl. ¶ 16 (agency endorsing Mr. Shapiro's concern).  Ms. Wilson objects that this harm is "contradicted by FCC rules and practice," which in certain circumstances affirmatively require disclosure of sensitive information if a company wishes to obtain (legally mandatory) agency approval for commercial transactions in the highly regulated commercial broadcast media market.  *See* Pl. Mem. at 3, 27, 37.

Neither party has met its summary judgment burden on this point.  The undisputed facts do not as a matter of law demonstrate that the agency's fear of reduced company candidness is reasonable, because if broadcast media companies are required to disclose sensitive commercial information or risk agency rejection of their transfer applications, *see supra* note 3, those companies are unlikely to withhold information solely because the information might become public through FOIA proceedings.  The incentives simply do not align.  *See* Pl. Mem. at 24–25; *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), *abrogated on*

*other grounds by Argus Leader*, 139 S. Ct. at 2356 ("*Nat'l Parks I*") (observing that, where companies were "required to provide . . . financial information to the government [in order to operate their businesses], there [was] presumably no danger that public disclosure [would] impair the ability of the Government to obtain this information in the future").  On the other hand, the undisputed facts also do not make clear that companies must disclose sensitive commercial information every time they seek agency approval for their dealings in the broadcast market.  *See supra* note 3.  If disclosure of that sort of information is rare, an order by this Court compelling disclosure here may indeed make companies more circumspect when communicating with the FCC.  There is simply too much ambiguity in the record to justify summary judgment to either party on this point.

Reduced company candor is not the only harm the agency foresees.  The FCC is also concerned that Sinclair and other media companies could suffer competitive or commercial harm if Sinclair's confidential information is disclosed.  *See* Nov. Santini Decl. ¶ 18; FCC Mem. at 25; FCC Reply at 6.  This concern about harm appears more speculative, however.  The agency couches its competitive harm concerns in the language of "could" rather than "would" or "will."  *See* Shapiro Decl. ¶¶ 10–11; Nov. Santini Decl. ¶ 18.[6]  "[T]he foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—[cause harm]."  *Reps. Comm.*, 3 F.4th at 369–70.  That formal rule is binding on this Court and prevents an award of summary judgment to the FCC at this stage of proceedings.

Summary judgment is also inappropriate because the FCC has failed to meaningfully pair the provisional competitive harms it foresees with the categories of information withheld.

---

[6] The only harm the agency foresees "would" occur from disclosure of Sinclair's confidential information is the harm to company candidness with the FCC.  *See* Kriesman Decl. ¶ 16.

"Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can articulate both the nature of the harm from release and the *link between* the specified harm and specific information contained in the material withheld." *Id.* at 369 (internal quotation and modification omitted) (emphasis added); *see also Investigative Reporting*, 436 F. Supp. 3d at 106 (observing that agencies must "connect the harms in a meaningful way to the information withheld") (internal quotation and modification omitted).

Some of the connections might be reasonably clear once the agency clarifies how it anticipates competitive harm to Sinclair and other broadcast media companies. The agency connects the disclosure of "strategic business decisions, including [Sinclair's] economic incentives for divesting particular stations or its internal processes for valuating the sale or acquisition of assets" to the harm that "future sale partners" could have an "advantage in future negotiations." Shaprio Decl. ¶ 11. That statement, adopted by the FCC through Ms. Kriesman's affidavit, *see* Kriesman Decl. ¶ 15, seems to link the agency's concern about competitive harm to the disclosure of materials reflecting Sinclair's internal deliberations about the Tribune deal and divestitures, the broadcast cash flow data and similar information compiled by Sinclair as it valued stations, similar data prepared by third parties for Sinclair's private use, and the guarantee agreements the company negotiated to support and structure the deals (categories a1, a2, a4, a5, b1, b2, b3, b4, b5, and b6). But the connection is not explicit. If the agency wishes to prevail on a future motion for summary judgment, it should draw a clear line between the disclosure of individual documents or categories of information withheld and the specific, nonspeculative harms the agency foresees.

Other connections are explicit but vague, and consequently will require additional explanation. The agency links disclosure of confidential information about the "private business

holdings of a Sinclair executive" (category b7) with provisional harms to "the interests of that person and his third-party companies by revealing information about the companies' ownership structure."  Nov. Santini Decl. ¶ 18.  Based on the agency's Vaughn Index, this category of information must include "[i]nformation concerning the private business interests of [] Sinclair executive[] David Smith."  *See* Vaughn Index at 5.  Sinclair provided that information to the FCC in response to an FCC LOI requesting an explanation of Mr. Smith's business relationship, if any, with Atlantic Automotive Corporation.  *See id.*; Ex. 1 to Pl. Mem., ECF No. 25-2 at *5. The agency has not explained how competitive harms anticipated within the broadcast media market would apply to Atlantic Automotive Corporation—a company that, from its name, may be involved in an entirely distinct line of business.  Similarly, the agency withheld from Ms. Wilson information that reveals the identities of Sinclair employees or executives responsible for determining divestiture purchase prices (category a3); that information may be linked to competitive harm in the broadcast industry, but is not explained in sufficient detail to satisfy the Court that the harm is reasonably foreseeable as a matter of law.

The agency has also failed to articulate any anticipated harm at all for the last category of information—information describing Sinclair's "involvement, or lack thereof, in the creation of WGN-TV, LLC" (category b8).  *See* Nov. Santini Decl. ¶ 18.  The agency may attempt again to establish foreseeable harm by supplementing the record, but summary judgment is not appropriate at this stage of proceedings.

Summary judgment must also be denied to Ms. Wilson.  Although the agency has so far failed to carry its burden with respect to its Exemption 4 withholdings, the undisputed material facts do not establish that the agency will be unable to do so as a matter of law.  Ms. Wilson suggests, for example, that no harm could possibly flow from the agency's release of the

broadcast cash flow numbers and multipliers she seeks.  *See* Pl. Mem. at 19.  She says these figures are "not real . . . , but rather fabrications provided to the FCC to support Sinclair's bogus claim that it acted in good faith."  *Id*.  Whether "real" or not—presumably figures are "real" in this sense if they accurately reflect market value or are based on generally accepted accounting principles, *see id.* at 17—the agency has provided a sworn declaration from an individual familiar with the media industry who asserts that broadcast cash flow numbers and multipliers are useful tools for assessing station value within the broadcast media market.  *See* Kriesman Decl. ¶ 14.  If released, the agency says these figures might be used to leverage negotiations surrounding KDAF, KIAH, and WGN-TV.  *See* Nov. Santini Decl. ¶ 18.  It is not inherently unreasonable to think that a station valuation—even an artificially deflated one, if Ms. Wilson is correct about Sinclair's maneuverings—might be wielded in future industry dealings affecting those stations.  Both parties may supplement the record on this point, but neither has satisfied its burden on the undisputed facts currently before the Court.

## II.     Protective Order

The FCC also moved for a protective order shielding from further disclosure information inadvertently revealed to Ms. Wilson in the agency's production of October 22, 2021.  *See* Mot. for Prot. Order.  The inadvertently disclosed material consists of the final paragraph of Sinclair's May 2019 submission to the FCC and a single sentence on the third page of Sinclair's July 2019 response to the FCC's LOI.  *See* Nov. Santini Decl. ¶¶ 10, 12–13.  The agency requested protective relief only as to the mistakenly disclosed paragraph in the May 2019 communication, referred to hereafter as the "Inadvertent Disclosure."  *See* FCC Mem. at 28 n.4; *see also* Mot. for Prot. Order at 1–2, 6 & n.1.  The agency has thus waived any objection to Ms. Wilson's use of the other mistakenly disclosed material in Sinclair's July 2019 LOI response.  To the extent that

the parties have interpreted the Court's Order of November 5, 2021 as reaching that sentence, Ms. Wilson is no longer required to refrain from disclosing, disseminating, or making use of that information.

The Court will partially grant the agency's motion for protective order and order Ms. Wilson to refrain from disclosing, disseminating, or making use of the Inadvertent Disclosure until the Court resolves the merits of the government's Exemption 4 withholding decisions. To aid its decision, the Court will require supplemental briefs on the issue of foreseeable harm. Although FOIA does not provide for protective orders or the compelled return or destruction of inadvertently produced material, federal courts have "long 'understood that certain implied powers must necessarily result to our Courts of justice from the very nature of their institution,' which 'are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Sierra Club*, 505 F. Supp. 3d at 988–89 (quoting *Chambers*, 501 U.S. at 43); *see also United States v. Moussaoui*, 483 F.3d 220, 236 (4th Cir. 2007); *Pub. Citizen*, 953 F. Supp. at 404. Those inherent powers are routinely used to bar parties from disseminating information inadvertently disclosed in FOIA proceedings, at least temporarily. *See, e.g.*, *Pub. Citizen*, 953 F. Supp. at 404; *ACLU I*, 2012 WL 13075284, at *5; *Hersh & Hersh v. Dep't of Health & Hum. Servs.*, No. 06-cv-4234, 2008 WL 901539, at *9 (N.D. Cal. Mar. 31, 2008).

There are nonetheless significant limits to the federal courts' inherent powers. *See Degen*, 517 U.S. at 829. The extent of such powers "must be delimited with care, for there is a danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority." *Id*. "Principles of deference counsel restraint in resorting to inherent power and require its use to be a reasonable response to

the problems and needs that provoke it." *Id.* (citing *Chambers v. NASCO*, 501 U.S. 32, 44

(1991); *Ortega-Rodriguez v. United States*, 507 U.S. 234, 244 (1993); *Thomas v. Arn*, 474 U.S.

140, 146–48 (1985)).  That is why at least one other federal court has declined to exercise its

implied power to bar dissemination of information inadvertently disclosed in a FOIA proceeding.

*See Sierra Club*, 505 F. Supp. 3d at 991.

Cases illustrating when the federal courts can and should use their inherent powers to

effectively permit the government to claw back information inadvertently disclosed in FOIA

proceedings illustrate several significant considerations.  The sole in-district precedent discussed

by the parties, *Public Citizen*, makes clear that courts may appropriately issue *temporary*

protective orders controlling mistakenly disclosed information.  *See* 953 F. Supp. at 404–05

(issuing protective order "until [the court] determines whether [the information] qualifies for

non-disclosure" and noting that "this order is only temporary in nature").

Whether a temporary protective order should then be extended to permanently bar further

dissemination of information is a harder question.  In *ACLU I*, the Southern District of New York

agreed to issue a permanent clawback order after the Department of Defense mistakenly

produced a document reflecting classified information about military detainees while complying

with a court-supervised, stipulated disclosure plan.  *See* 2012 WL 13075284, at *1, *3.  The

agency asked the court to confirm that the document could have properly been withheld as

classified and, if so, to order the plaintiffs to return it.  *Id.* at *2.  The court held that the

document was in fact classified and that its disclosure could reasonably be expected to harm

national security.  *Id.* at *5.  The court then relied on its inherent equitable powers to compel the

plaintiffs to return the document, reasoning that the court's powers had been invoked not solely

by the agency's request for protective relief, but also by the plaintiff's initiation of their FOIA

action and invitation to the court to supervise their stipulation with the agency.  *See id.*  Also significant was the scope of harm that could result if classified information impacting the national security was made public.  "Surely," the court reasoned, "if a district court in a FOIA case has the authority to order the return of . . . inadvertently produced documents wholly unrelated to national security, then this Court has the authority to order the return an inadvertently produced classified document that implicates national security and which Plaintiffs are not authorized to possess."  *Id.* (citing *Hersh*, 2008 WL 901539, at *9; *Al-Haramain Islamic Found. v. Bush*, 451 F. Supp. 2d 1215, 1229 (D. Or. 2006), *rev'd in part on other grounds*, 507 F.3d 1190 (9th Cir. 2007)).

On the other hand, *Sierra Club* explains why a request for protective relief in a FOIA case is an "extraordinary" ask that should not be granted as a matter of course.  505 F. Supp. 3d at 992.  Observing that "[m]any mistakes by litigants have consequences," the Northern District of California declined to use its implied power to compel the destruction of disclosed material after the government released partially redacted emails but "inadvertently failed to redact in all instances" the names of three petroleum lobbyists and their business email addresses.  *Sierra Club*, 505 F. Supp. 3d at 984–85, 991–92.  The releasing agency had planned to withhold the information under FOIA Exemption 6, which protects personal privacy interests.  *See id.* at 985. The agency could not identify any "serious and non-speculative harm likely to result from Sierra Club's continued possession" of the information.  *Id.* at 992.  So the court declined to order destruction of the documents, reasoning that no authority offered "a compelling rationale for holding that a court should wield its inherent authority to compel the return or destruction of documents produced under FOIA any time the producing agency could have invoked a statutory exemption but inadvertently failed to do so."  *Id.* at 991.

It is clear from these cases that this Court can grant the FCC protective relief.  As discussed above, the Court requests that the parties supplement the record to demonstrate the harm that will result from the public disclosure of the withheld materials.  The more robust record developed through supplemental briefing will provide further insight into the harm likely to occur if the Inadvertent Disclosure is left public and whether the FCC properly invoked FOIA Exemption 4.  *Id.* at 992.  However, in the interim, Ms. Wilson should not be allowed to use or further publicize the inadvertently disclosed information.  Accordingly, the Court grants in part the Motion for Protective Order, and orders that, pending resolution of the propriety of the FCC's withholding decisions after the submission of supplemental briefing, Ms. Wilson and her counsel shall not disclose, disseminate, or make use of the Inadvertent Disclosure.

## CONCLUSION AND ORDER

For these reasons, the FCC's motion for a protective order, ECF No. 21, is GRANTED IN PART.  Ms. Wilson's first motion for summary judgment, ECF No. 15, is DENIED as MOOT.  Ms. Wilson's revised motion for summary judgment, ECF No. 25, and the FCC's cross-motion for summary judgment, ECF No. 26, are both DENIED WITHOUT PREJUDICE.  The undisputed material facts show that the information withheld from Ms. Wilson is "confidential commercial information" within the meaning of FOIA Exemption 4, but at this time, the government has failed to prove that release of the information would "harm an interest protected by" the exemption, and Ms. Wilson has not demonstrated that the agency cannot meet that burden as a matter of law.  The parties shall confer and submit a proposed schedule for submitting renewed motions for summary judgment to address this issue.

 Dated: September 15, 2022

 

 
_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE